REYNA, Circuit Judge,
dissenting.
I dissent for three reasons. First, the intrinsic record is devoid of any description of a wireless “datalink” structure. Second, credible extrinsic evidence belies the majority’s conclusion that “datalink” encompasses wireless communications. Third, the majority relies on expert testimony that is conclusory and unreliable.
Despite these determinative criteria, the majority construes “datalink” as covering any way of communicating data, including wireless structures. This construction literally encompasses all data communication technology regardless of whether it existed in 1993 when the patents were filed, whether it was created yesterday, or whether it shall be created in the future. Neither the record before us nor our case law supports such a construction. Because I will not extend the literal scope of the patent beyond what is clearly claimed, I respectfully dissent.
I.
The claim language demonstrates that “datalink” is a meaningful structural limitation. The asserted claims are system claims. They recite that messages are sent “over a/the datalink,” “by a/the datal-ink,” and “via a/the datalink.” They also indicate that the “datalink” is the structure used to “couple” or “communicatively couple” the remote station and the interface board on the bed. This is clearly indicated by the recited claim language: “coupled ... by a datalink” and “communicatively coupled ... by a datalink.” See '038 patent claim 13; '659 patent claim 13. Thus, the context in which the “datalink” limitation is recited indicates that “datalink” must be more precise than anything that would “couple” or “communicatively cou- *1383 pie” the interface board and the remote station.
Further, the written description does not describe “datalink” as any way of communicating data. To the contrary, the written description emphasizes that a “da-talink” is physical structure. First, the written description consistently refers to a “datalink” as a “serial datalink.” See, e.g., '038 patent col. 20 11. 27-41. Second, as the majority recognizes, the written description uses “datalink” in a manner synonymous with a cable, which is a physical structure. See, e.g., '038 patent col. 6 11. 30-31, 47. This is consistent with the sole depiction of a datalink in figure 1 as a physical cable connecting the interface board to the wall interface unit. Id. fig. 1, col. 6 11. 29-33. Finally, the patent teaches that the “datalink” serves to “electrically couple” components of the system. See id. abstract, col. 6 1. 49. Such an electrical coupling would be impossible without a medium for carrying the electrical signals.
The recitations in other, non-asserted claims further indicate that the patent’s “datalink” must be a physical structure. Claim 12 expressly requires the “datalink” to be “in line” with an “optical isolator electrically connected between said interface board and said processing station.” Id. col. 23 11. 43-47. The only way the “datalink” could also connect the interface board and processing station while being “in line” with the electrically connected “optical isolator” is if it is a physical structure. See Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc), cert. denied, 546 U.S. 1170, 126 S.Ct. 1332, 164 L.Ed.2d 49 (2006) (“the usage of a term in one claim can often illuminate the meaning of the same term in other claims”) (citation omitted).
Put simply, everything within the intrinsic record identifies the claimed “datalink” as a physical structure. There is nothing in the claims, written description, or file history that indicates the claimed “datal-ink” embraced wireless communications.
II.
In addition to clear intrinsic evidence, the majority also disregards credible extrinsic evidence regarding the understanding of “datalink” in the context of the patents-in-suit. Specifically, the majority ignores that in 2007, fourteen years after the filing date of the patents-in-suit, Hill— Rom filed Patent Application No. 11/672,-367 (“the '367 application”), which was expressly directed to wireless bed connections. See J.A. 344. As originally filed, the only material difference between claim 1 of the '367 application and the inventions disclosed and claimed in the patents-in-suit was the explicit use of wireless communication technology:
1. A hospital bed having wireless communication circuitry operable to transmit bed status data wirelessly to a network and to receive messages wirelessly from the network, the bed having a mattress associated therewith and the bed status data including information regarding at least one feature of the mattress.
J.A. 348-49. The '367 application did not claim priority to any of the patents-in-suit. The application further characterized the patents-in-suit as “Background of the Invention,” J.A. 345 ([0003]), and described these background systems as limited to wired systems:
Hospital beds that connect to nurse call systems, typically do so via a wired connection established by a nurse call cable that extends between the bed and an interface unit having a jack mounted on *1384 a wall or headwall unit in the hospital room in which the bed is situated.
J.A. 345 ([0004]) (emphasis added). Then, in the “Summary of the Invention,” the '367 application contrasted itself against the prior art through the use of wireless connectivity. E.g., J.A. 345 ( [0006]). The '367 application expressly differentiated itself from the patents-in-suit in this exact manner by asserting that “according to this disclosure, the standard bed status data is transmitted wirelessly.” J.A. 346 ([0052]). The only reasonable conclusion that can be drawn from the filing of the '367 application, now patented, is that Hill-Rom itself — presumably one of ordinary skill in the art — both recognized and understood the earlier patents-in-suit as lacking a wireless datalink.
Additionally, in 2011, a patent examiner reviewing the patentability of Hill-Rom’s wireless bed patent concluded that the patents-in-suit do not themselves embrace wireless “datalinks.” The examiner stated that the patents-in-suit do “not teach” either “a first transmitter that transmits the first ID wirelessly” or “the bed having a wireless receiver and a second transmitter.” J.A. 354. The examiner further concluded that it was necessary to combine the patents-in-suit with another reference that expressly taught “wireless transmission between a wireless unit associated with a bed, and a remote unit” in order to achieve an overall, combined system that included “wireless communication capabilities.” J.A. 355. The examiner’s remarks do not, as the majority contends, simply confirm that the patents do “not teach ... the bed having a wireless receiver.” Maj. Op. at 1373. Rather, the examiner understood that the patents-in-suit did not include wireless communications, which necessarily means that he did not consider the “datalink” disclosed in the patents-in-suit to reach such wireless technology. The majority fails to acknowledge the full scope of the examiner’s statements, which were made by an uninterested party outside the scope of the present litigation, a material element in the analysis of the evidentiary record.
III.
Despite the limited scope of the intrinsic and extrinsic record, the majority construes “datalink” as “any link over which data is transferred and can be wired or wireless.”[1] Maj. Op. at 1374. This construction reaches any and every method of communicating data, which is an expansive functional interpretation — defining the “datalink” structure by what it does rather than what it is. This functional claiming is not only prohibited outside of the context allowed by 35 U.S.C. § 112(f), but is also not supported by the record.
The majority justifies the construction by relying on a single piece of evidence created solely for Hill-Rom’s use in the present litigation. In doing so, the majority states:
Indeed, the only evidence in the record of how one of ordinary skill in the art at the time of filing would understand the *1385 term “datalink” is from Hill-Rom’s expert. He testified that as of the effective filing date of the patents-in-suit, “a person of ordinary skill would understand that ‘datalink’ does not refer solely to physical connection” and “can be established over wired, wireless, optical, or other connection.” J.A. 454, 472.
Maj. Op. at 1374. This testimony from Hill-Rom’s expert, however, does not directly speak to the meaning of the term in 1993 and, at best, is ambiguous on the issue before us.
Importantly, the expert report never expressly states that one of ordinary skill in the art in 1993 would understand that a “datalink” encompassed wireless connections. We have long recognized that, although the understanding of a claim term can evolve over time, the literal scope of a patent claim “cannot have different meanings at different times.” PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1363 (Fed.Cir.2005). The literal scope of a claim is fixed by the meaning of its terms in the relevant art as of the effective filing date of the application. Phillips, 415 F.3d at 1313 Cir.2005 (“We have made clear ... that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.”). Here, the patents-in-suit claim priority to an application filed in 1993 and, a proper construction of the claims must be tethered to that date.
Hill-Rom’s expert, however, testified before the district court that “datalink” needed no construction and provided explanations that were each phrased in the present tense. J.A. 471-72. Specifically, the expert testified:
Datalinks are used by network designers to transfer data from one device to another. Thus, a “datalink” is used in many different fields and applications, and is not confined solely to the connection to a hospital bed. A person of ordinary skill in the art would understand that a datalink can be used in an unlimited number of contexts where digital data is to be transmitted.
Id. (emphases added); see also id. at 472 (“would understand that ‘datalink’ does not refer solely to physical connection” and “a datalink can be established over wired, wireless, optical or other connection”) (emphases added). In view of Hill-Rom’s bare attempt to embrace wireless communications under the purported plain meaning of the term “datalink,” the expert testimony does not demonstrate a temporal connection to 1993, as it must.
Beyond ambiguity, the expert’s testimony is also conclusory. There is no documentary evidence — dictionary definition, paper, article, advertisement, product, system, method, etc. — to support his testimony. As such, the reasoning set forth in SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187 (Fed.Cir.2013) is applicable to this case. There we recognized that the evidentiary value of conclusory expert testimony in the context of claim construction is suspect and unhelpful:
Expert testimony, in particular, is less reliable because it “is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence.” For that reason, “conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.”
In whole, [the expert’s] opinions are unhelpful to our analysis here. They are *1386 conclusory and incomplete; they lack any substantive explanation tied to the intrinsic record; and they appear to conflict with the plain language of the written description. Without a more detailed explanation of how [the expert] formed his conclusions and why they conflict with the plain language of the specification, we must agree with the district court that [the expert’s] testimony deserves no weight.
Id. at 1195, 1210 (citations omitted).
In sum, the record before us does not clearly establish that the claims of the asserted patents encompass wireless datal-inks. Where there is no support in the intrinsic record for a proffered construction, a party seeking a purported “plain meaning” construction that is broader than what is supported by the intrinsic record must supply credible extrinsic evidence that sufficiently demonstrates the subject matter embraced by the “plain meaning” was known to one of ordinary skill in the relevant art at the time the patent was filed. Hill-Rom has not made such a showing here.
The majority’s conclusion to the contrary is outweighed by reliable record evidence that the majority either mis-comprehends or ignores. Under these circumstances, the asserted term is properly limited to a physical connection. Moreover, limiting the claimed “datalink” to a physical connection is entirely consistent with Hill-Rom’s claim differentiation arguments, as a physical connection encompasses, but is not limited to, a wired datalink.
For the foregoing reasons, I respectfully dissent.

. The phrase "can be wired or wireless” is permissive and renders itself superfluous. It therefore does not meaningfully add to the majority’s construction. On remand, the full scope of "any link over which data is transferred” must be considered in evaluating both infringement and invalidity. See Source Search Techs., LLC v. LendingTree, LLC, 588 F.3d 1063, 1075 (Fed.Cir.2009) (“ '[i]t is axiomatic that claims are construed the same way for both invalidity and infringement' ”) (quoting Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed.Cir.2003)).